## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **METRO CONTAINER GROUP,** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| **v.** | : | |
| | : | **No. 18-3623** |
| **AC&T CO., INC. et al.,** | : | |
| *Defendants* | : | |

## MEMORANDUM

PRATTER, J.                                                        DECEMBER 6, 2021

The Metro Container Group ("Metro"), an unincorporated association of several entities, has sued numerous defendants pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, for cost recovery, contribution, and declaratory relief related to costs Metro incurred in various efforts to remove contamination at the Metro Container Site in Trainer, Pennsylvania.

Of the hundreds of defendants still involved in the litigation, five seek to dismiss the Second Amended Complaint for lack of personal jurisdiction, expiration of the statute of limitations, or improper service.[1] The Court will deny the motions based on personal jurisdiction without prejudice to allow narrow jurisdictional discovery. As to the defendants for whom Metro has not established notice prior to service of the First Amended Complaint, the Court will dismiss the claims with prejudice for failure to satisfy the statute of limitations.

---

[1] One of these defendants, Houff Transfer, moves for judgment on the pleadings. Functionally, its arguments are the same as those found in the other statute of limitations motions.

## BACKGROUND

Metro[2] alleges that numerous defendants are liable for the release and/or threat of release of hazardous substances from the facility known as Metro Container Site located in Delaware County, Pennsylvania.  The Metro Container Site encompasses eleven acres of industrial area about 20 miles southwest of Philadelphia.  In 2015, the EPA notified "potentially responsible parties" (PRPs) of their opportunity to participate in a remedial investigation and feasibility study for the Site.  In response to the EPA's 2015 notice letter, members of the Metro Container Group entered into an Administrative Settlement Agreement and Order with the EPA, for further study of the scope of contamination at the Site.  The agreement required payment of EPA's future oversight costs, and the establishment of financial assurance for the benefit of EPA in the amount of $1,500,000.

The EPA and the members of the Metro Container Group also entered into a separate Administrative Settlement Agreement and Order on Consent for Removal Action, which purportedly took effect in September 2015.  The agreement also required reimbursement of EPA's future oversight costs.  Metro alleges that to date it has incurred over $5 million in response costs at the Metro Container Site.

---

[2] The Metro Container Group is an unincorporated association that consists of the following members, in their own right: Exxon Mobil Corporation; ExxonMobil Oil Corporation; BP Products North America Inc.; BP Lubricants USA Inc.; Atlantic Richfield Company; E.I. du Pont de Nemours and Company; Chevron Environmental Management Company, for itself and as Attorney-in-Fact for Chevron U.S.A. Inc.; Superfund Management Operations, a series of Evergreen Resources Group, LLC (for itself and for Sunoco, Inc. (R&M) (f/k/a Sun Refining and Marketing Company) and Sunoco, Inc. (f/k/a Sun Oil Company)); Rohm and Haas Company; Tunnel Barrel and Drum Co., Inc.; Veolia ES Technical Solutions, LLC; and Stauffer Management Company LLC, as litigation agent for Bayer Crop Science, LP, successor to Stauffer Chemical Company. Each of the members of the Metro Container Group is an assignee of the CERCLA claims at the Metro Container Site of those entities who have settled or will settle with the Metro Container Group, and each member has assigned its claims in this case to the association. All of the members of the Metro Container Group are signatories to the two settlements made with the EPA that govern the cleanup efforts at the Site: RI/FS AOC and the Removal Action AOC.

Metro alleges that each of the defendants transported waste to the Site or arranged that waste at the Site be treated and/or disposed of at the Site. Metro also claims certain of the defendants are "responsible for" other actors who contributed to the accumulation of waste at the Site. Such hazardous substances purportedly contaminated the soil and groundwater at and near the Site.

Metro initiated this litigation in August 2018 by filing the "Original Complaint." The case was stayed early in its life because the parties sought to achieve early settlements with as many parties as possible.[3] Over the course of the stay, Metro voluntarily dismissed numerous defendants. The litigation re-commenced procedurally in June of 2019, with the filing of the First Amended complaint, namely, asserting the same causes of action as sought in the initial complaint: cost-recovery and contribution from each of the defendants for past and future costs incurred for response activities, and a declaration with respect to each defendant's share of liability for future incurred response costs. In the First Amended Complaint, Metro named over 400 defendants. Numerous defendants were then also dismissed.

By the Fall following the filing of the First Amended Complaint, many motions to dismiss were filed. The Court stayed discovery pending the outcome of the first round of motions to dismiss. Thereafter, the Court granted in part and denied in part the motions to dismiss, permitting Metro to propose limited jurisdictional discovery on the issue of successor liability. One of the parties, D&B Express, sought reconsideration of the Court's denial of its motion to dismiss on statute of limitations grounds because, although named in the Original Complaint, D&B Express

---

[3] In its Motion for Stay, Metro represented that it sought the stay "to issue settlement offers to all named defendants that are viable" and "to dismiss settling defendants and non-viable defendants to try to reduce this case as quickly and as efficiently as possible over the next twelve months or so." Doc. No. 2 ¶ 9.

did not actually receive notice of the action until served with the First Amended Complaint. The Court granted D&B Express's motion and dismissed them from the case with prejudice.

After receiving briefing from the parties regarding Metro's proposed discovery plan, the Court allowed limited discovery to proceed for two groups of defendants: jobber/transporter defendants and corporate/successor liability defendants.[4]

The five moving defendants seek to dismiss Metro's Second Amended Complaint based on Rules 12(b)(2), 12(b)(6), and/or Rule 12(c). The Court heard counsel's excellent oral arguments on the motions. The parties submitted supplemental briefing and the motions are now ripe for consideration.

## LEGAL STANDARD

### I.    Federal Rule of Civil Procedure 12(b)(6)

As is well-documented, a Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. While Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "to give the defendant fair notice of what the claim is and the grounds upon which it rests," the plaintiff must provide "more than labels and conclusions[;] a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Instead, to survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

---

[4] This discovery began in June 2021. On August 5, 2021, Metro and Hoffman La-Roche filed a joint stipulation excusing HLR from this discovery because the parties did not dispute successor liability for HLR. Doc. No. 2321 ¶ 8.

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. The Court assumes that the allegations in the complaint and all reasonable inferences emanating from the allegations are true, viewing those facts and inferences in the light most favorable to the non-moving party. *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). That admonition does not demand that the Court ignore or even discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences." *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 184 (3d Cir. 2000) (internal quotation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. This necessarily leads to a balancing of familiar considerations with which the lawyers and litigants in this case are well-versed.

## II.     Federal Rule of Civil Procedure 12(c)

The standard for evaluating a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) for failure to state a claim is the same as the familiar standard used for evaluating a motion to dismiss under Rule 12(b)(6). *See, e.g., Turbe v. Gov't of V.I.,* 938 F.2d 427, 428 (3d Cir. 1991); *Revell v. Port Auth.,* 598 F.3d 128, 134 (3d Cir. 2010) (citing *Turbe,* 938 F.2d at 428); *Shelly v. Johns–Manville Corp.,* 798 F.2d 93, 97 n. 4 (3d Cir. 1986). In fact, because "Rule 12(h)(2) provides that '[a] defense of failure to state a claim upon which relief can be granted' may be advanced in a motion for judgment on the pleadings under Rule 12(c)," the distinction between a motion under 12(b)(6) and a motion under 12(c) "is purely formal." *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir. 1990).

## III.     Federal Rule of Civil Procedure 12(b)(2)

In ruling on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the Court also takes the allegations of the complaint as true. *Stann v. Olander Prop. Mgmt. Co.,* No. 11-cv-

7865, 2014 WL 3628588, at *2 (E.D. Pa. July 23, 2014). However, once a jurisdictional defense is raised, the plaintiff bears the burden of proving, through affidavits or competent evidence, contacts with the forum state sufficient to establish personal jurisdiction. *See Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996). The plaintiff must establish those contacts with reasonable particularity. *See Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1996). Once the plaintiff makes out a prima facie case in support of personal jurisdiction, the burden shifts to the defendant to establish that some other considerations exist which would render exercise of personal jurisdiction unreasonable. *Stann*, 2014 WL 3628588, at *2 (citing *Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992)).

DISCUSSION

Each of the five moving parties bases their motion on either personal jurisdiction or statute of limitations defects. The Court addresses each challenge in turn.

## I.   Personal Jurisdiction

### a.   Parties' Arguments

Hoffman-La Roche (HLR) and Zenith Home Corp. ("Zenith Home) dispute this Court's personal jurisdiction over them. They contend that they do not have sufficient contacts with the Commonwealth of Pennsylvania to establish either general or specific personal jurisdiction. Zenith Home also disputes Metro's theory of successor liability, arguing that they are not related to, or responsible for waste attributable to, the following parties named in the Original Complaint: "Zenith Products Corporation," "Zenith Metal," and "Zenith Metal Products."

In response, Metro contends it has sufficiently alleged contacts to establish both general and specific personal jurisdiction for each defendant. Metro argues that, while Pennsylvania is not the place of either defendant's headquarters or state of incorporation, Metro has alleged such continuous and systematic contacts to render each defendant "essentially at home" in Pennsylvania

for general personal jurisdiction. Alternatively, Metro argues that each defendant is subject to general personal jurisdiction based on their registration to do business in Pennsylvania, which requires consent to such jurisdiction. Metro also asserts that each defendant is subject to specific personal jurisdiction for this action based on their responsibility for the drums that ended up in Pennsylvania.

b. General Personal Jurisdiction

The determinative issue for purposes of general personal jurisdiction is whether the defendant is essentially "at home" in the forum state. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). A corporation is typically "at home" in its place of incorporation and principal place of business. *Id.* Since *Daimler*, the Third Circuit Court of Appeals has noted that "it is incredibly difficult to establish general jurisdiction over a corporation in a forum other than the place of incorporation or principal place of business." *Chavez v. Dole Food Co., Inc.*, 836 F.3d 205, 223 (3d Cir. 2016) (internal quotation omitted). However, Metro argues that, under *Daimler*, a corporation's contacts can be "so continuous and systematic as to render it essentially at home in the forum State." *Daimler*, 571 U.S. at 139 (internal quotation omitted).

1. **Hoffman-La Roche**

Metro argues that the allegations in its Second Amended Complaint, when taken as true and with all reasonable inferences drawn in its favor, demonstrate that HLR maintained sufficiently continuous and systematic contacts for general jurisdiction to apply. Metro also asserts that, absent an evidentiary hearing, a plaintiff only needs to establish a prima facie case of personal jurisdiction to survive a Rule 12(b)(2) motion to dismiss at this stage and is entitled to have its allegations regarding jurisdiction taken as true and any inferences drawn in its favor. *See O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007).

However, Metro's Second Amended Complaint does not establish a prima facie case of general personal jurisdiction based on HLR's contacts with Pennsylvania. HLR is incorporated in New Jersey and its headquarters location is New Jersey. There are no allegations which could establish that HLR is "essentially at home" in neighboring Pennsylvania. In support of its argument regarding HLR's contacts with Pennsylvania, Metro selectively quotes two paragraphs of its Second Amended Complaint leaving out the portion of the paragraphs alleging that HLR has conducted business "in *New Jersey* since approximately 1928." *Compare* Doc. No. 2067 ¶ 277 (emphasis added), *with* Doc. No. 2246, at 18. The cited portions of the Second Amended Complaint weaken, rather than support, a prima facie case that HLR is "essentially at home" in Pennsylvania. Metro fails to allege sufficient facts to establish a prima facie case of general personal jurisdiction over HLR under *Daimler*.

Alternatively, Metro argues that HLR's registration to do business in Pennsylvania "is *per se* consent to jurisdiction under the laws of Pennsylvania and binding precedent of the Third Circuit." Doc. No. 2246, at 2. Under 42 Pa. Cons. Stat. § 5301(a)(2), "[i]ncorporation under or qualification as a foreign corporation under the laws of" Pennsylvania constitutes a sufficient basis for consent to general personal jurisdiction. In *Bane v. Netlink, Inc.*, 925 F.2d 637, 641 (3d Cir. 1991), the Third Circuit Court of Appeals held that "[b]y registering to do business in Pennsylvania, [a corporation] 'purposefully avail[s] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* at 640 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

HLR does not dispute that it is registered to do business in Pennsylvania, but argues that the Supreme Court's decision in *Daimler* superseded *Bane*. In *Daimler,* the Supreme Court shifted away from the purposeful availment approach, clarifying that this approach is relevant only to

8

specific jurisdiction. *Daimler*, 571 U.S. at 138 n.13. The Court found that "the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business . . . is unacceptably grasping." *Id.* Since this shift in jurisdictional analysis, courts in this District have differed on the viability of the Pennsylvania statutory scheme and *Bane*. *Compare Ruffing v. Wipro Ltd.*, No. 20-cv-5545, 2021 WL 1175190, at *5 (E.D. Pa. Mar. 29, 2021), *appeal docketed*, No. 21-2424 (3d Cir. July 29, 2021) ("As the standard for determining general personal jurisdiction has changed since *Bane* was decided, we agree that *Bane* is no longer binding on this court."); *Reynolds v. Turning Point Holding Co.*, No. 19-cv-1935, 2020 WL 953279, at *5, (E.D. Pa. Feb. 26, 2020) (same); *In Re Asbestos Liab. Litig.*, 384 F. Supp. 3d 532, 543 (E.D. Pa. 2019) (referred to as "*Sullivan*") (holding that the Pennsylvania registration scheme violates Due Process), *with Bors v. Johnson & Johnson*, 208 F. Supp. 3d 648, 653 (E.D. Pa. 2016) ("The ruling in *Daimler* does not eliminate consent to general personal jurisdiction over a corporation registered to do business in Pennsylvania."); *Berk v. Equifax, Inc.*, No. 19-cv-4629, 2020 WL 868128, *4 (E.D. Pa. Feb. 21, 2020) (agreeing with reasoning of *In re Asbestos*, but following *Bane* as binding precedent).

In *Sullivan,* the court analyzed whether the Pennsylvania statutory scheme comports with the demands of the Due Process Clause. The Supreme Court "has recognized that the state cannot condition a benefit generally available to others in the state on the surrender of a constitutional right." *Sullivan*, 384 F. Supp. 3d at 541 (citing *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604, 606 (2013)). Applying the unconstitutional conditions doctrine, the *Sullivan* court held that the Pennsylvania statutory scheme is unconstitutional "because it conditions the benefit of doing business in the state with the surrender of constitutional due process protections." *Id.* at 542.

In contrast, the *Bors* opinion cited by HLR distinguished *Daimler* because it did not involve consent to jurisdiction. 208 F. Supp. 3d at 650. The court in *Bors* applied *Bane* based on a corporation's consent to jurisdiction, explaining that "[w]e do not see a distinction between enforcing a forum selection clause waiving challenges to personal jurisdiction and enforcing a corporation's choice to do business in the Commonwealth." *Id.* at 655. However, as the *Sullivan* court noted, the Pennsylvania statutory scheme offers only a "Hobson's choice" for corporations seeking to conduct nationwide business. Thus, it differs from other forms of consent to jurisdiction such as forum selection clauses because it does not constitute voluntary consent. *Sullivan*, 384 F. Supp. 3d at 541, 543. The court also noted that allowing all 50 states to require consent to general jurisdiction as a condition of doing business in each state would run contrary to *Daimler*. *Id.* at 540–41.

This Court agrees that "the constitutional regime under which *Bane* was decided has been superseded by a newer standard." *Id.* at 543. The Third Circuit Court of Appeals has recognized that "[w]hen a constitutional standard is replaced by newer Supreme Court law contrary to the law of the circuit, 'the old standard is not binding' on lower courts." *Id.* at 544 (quoting *Planned Parenthood of Se. Pa. v. Casey*, 947 F.2d 682, 697–98 (3d Cir. 1991), *aff'd in part, rev'd in part*, 505 U.S. 833 (1992)). The *Bane* reasoning directly contradicts *Daimler*. Thus, "this Court is bound to apply the new *Daimler* standard notwithstanding previous circuit law." *Sullivan*, 384 F. Supp. 3d at 545. This Court does not, therefore, find that HLR's registration to do business in Pennsylvania subjects it to general personal jurisdiction.

### 2. Zenith Home Corp.

Metro also argues that Zenith Home is subject to general personal jurisdiction in Pennsylvania because its alleged predecessor, Zenith Products, had continuous and systematic

contacts with Pennsylvania "from at least 1965" with a Pennsylvania address.  Doc. No. 2129, at 16.[5]   Metro argues that its allegations support the reasonable inference that Zenith Products merged into and became one and the same as Zenith Home through a statutory merger or consolidation or, alternatively, a de facto merger.  Zenith Home argues that its headquarters and principal place of business are in Delaware and that Metro has not plausibly alleged successor liability for Zenith Products Corp.

"CERCLA incorporates common law principles of indirect corporate liability, including successor liability." *United States v. Gen. Battery Corp.*, 423 F.3d 294, 298 (3d Cir. 2005).  "To impute the jurisdictional contacts of one corporate entity to another corporate entity, Plaintiff must plead facts supporting a plausible conclusion that the alleged successor entity is a 'mere continuation' of, is 'the same' as, or 'is not distinct from,' the alleged predecessor entity." *Thomas-Fish v. Aetna Steel Prod. Corp.*, No. 17-cv-10648, 2019 WL 2354555, at *2 (D.N.J. June 4, 2019) (internal quotation omitted).  "In determining whether a transaction is a de facto merger or continuation, [courts in the Third Circuit] look to the following factors: (1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.  (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation. (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible. (4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the

---

[5]  Although Metro asserts that it "does not waive arguments that the Court also has personal jurisdiction over Zenith Home" based on its business registration, Doc. No. 2129, at 16 n.5, the Court rejects this basis for the reasons just discussed *supra*.  Thus, the Court bases its analysis on whether the jurisdictional contacts of Zenith Products should be imputed to Zenith Home.

uninterrupted continuation of normal business operations of the seller corporation." *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 468–69 (3d Cir. 2006).  The second factor, continuity of stock ownership, is the "essential element," but is not mandatory.  *Id.* at 469.

Metro alleges that Zenith Products contributed drums to the Metro Container Site. Although Metro does not explicitly allege that Zenith Products was incorporated in or had its principal place of business in Pennsylvania, this is a plausible inference from the allegation that "Zenith Products was founded by the Roggio Brothers in Philadelphia, PA in the 1940s, and it relocated to Aston, PA in the 1980s after a fire."  Doc. No. 2067 ¶ 667.  Therefore, if Metro establishes successor liability for Zenith Products, this Court would have personal jurisdiction over Zenith Home.

In the Second Amended Complaint, Metro alleges that "[a]n archived copy of Zenith Products' website shows that it is now Zenith Home's website" and that the property at which Zenith Home is currently located was transferred from Zenith Products to "ZPC Acquisition Corporation" in 2015.  *Id.* ¶¶ 673–676.  In its motion to dismiss, Zenith Home argues that "Metro provides no allegations regarding a continuity of management, personnel or general business operations between ZHC and any purported successor" or "any facts concerning the dissolution of the selling corporation, or any assumption of obligations by ZHC."  Doc. No. 2091-2, at 10.

However, Metro has called into question Zenith Home's assertions that it "did not exist prior to 2015," *id.* at 8, and should not be subject to this Court's jurisdiction through the actions of Zenith Products.  In Zenith Home's public-facing materials, "Zenith Home holds itself out as being '[f]ounded in 1947.'"  Doc. No. 2129, at 13 (quoting Doc. No. 2129-7, at 2).[6]  Metro alleges that Zenith Products was founded in the 1940s, creating the plausible inference that Zenith Products

---

[6] Metro also includes a Google Maps image of Zenith Home's headquarters sign, which reads "Zenith Products Corp."  Doc. No. 2129-6.

was the predecessor of Zenith Home.  In attaching Exhibit A to show that Zenith Home did not exist prior to 2015, Zenith Home also calls its own argument into question.  Zenith Home's Exhibit A is a certificate of "'ZPC Acquisition Corporation,' changing its name from "ZPC Acquisition Corporation' to 'Zenith Home Corp.'"  Doc. No. 2091-4, at 2.  Based on Metro's allegations in the Second Amended Complaint, it appears plausible that Zenith Home is a continuation of Zenith Products.

Metro argues that because the parties at issue here are privately-held, Metro should be allowed certain discovery of information that Zenith Home possesses to determine which theory of indirect corporate liability applies.  "[I]f the plaintiff's claim is not clearly frivolous as to the basis for personal jurisdiction, the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 336 (3d Cir. 2009) (internal quotation omitted).  Metro's claim that Zenith Home is a continuation of Zenith Products is not frivolous because publicly available materials do in fact suggest a relationship between the two entities.  And "jurisdictional discovery [is] particularly appropriate where the defendant is a corporation." *Id.*  Therefore, if the concerned parties persist in this fine (albeit important) point of dispute, the Court will allow narrow jurisdictional discovery on the issue of the connection between Zenith Products and Zenith Home.

c.  Specific Personal Jurisdiction

Metro argues that this Court also has specific personal jurisdiction over HLR and Zenith Home based on the drums sent to the Pennsylvania Site by HLR and Zenith Home's alleged predecessor, Zenith Products.

The "essential foundation" of specific jurisdiction is the "relationship among the defendant, the forum, and the litigation." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408,

13

414 (1984); *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021) (quoting same). "For specific jurisdiction to exist, three requirements must be met: (1) the defendant must 'purposefully direct its activities' at the forum state, (2) the litigation must 'arise out of or relate to' at least one of the defendant's activities in the forum state, and (3) the exercise of jurisdiction must comport with traditional notions of 'fair play and substantial justice.'" *Fin. Software Sys., Inc. v. Questrade, Inc.*, 2018 WL 3141329, *3 (E.D. Pa. June 27, 2018) (quoting *O'Connor*, 496 F.3d at 317).

The Supreme Court has rejected the "stream-of-commerce" theory of personal jurisdiction and requires a more exacting standard whereby "plaintiffs must instead rely on 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018) (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 109 (1987)). "When a defendant raises the defense of the court's lack of personal jurisdiction, the burden falls upon the plaintiff to come forward with sufficient facts to establish that jurisdiction is proper." *Mellon Bank*, 960 F.2d at 1223.

### 1. Hoffman-La Roche

Hoffman La-Roche argues that it did not "purposefully direct" the drums from New Jersey to Pennsylvania because it used third parties for disposal and courts have rejected the stream-of-commerce theory of personal jurisdiction. Metro argues that Hoffman La-Roche contracted for the disposal of the drums from facilities near the Metro Container Site and argues that the Court could easily infer purposeful availment. Alternatively, Metro seeks jurisdictional discovery to

ascertain Hoffman La-Roche's contractual relationship with the third parties carrying out the disposal (Mobil and JTM Drum).

First, HLR asserts that the unilateral actions of Mobil and/or JTM Drum do not support the exercise of specific personal jurisdiction over HLR. *See Asahi*, 480 U.S. at 112 ("[A] defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State."). Metro takes issue with HLR's position that HLR did not purposefully direct the disposal of its drums to the Metro Container Site but rather that Mobil and JTM Drum unilaterally took them from New Jersey to Pennsylvania. Metro argues that HLR contracted for the disposal of its drums and the Court can easily infer that HLR intentionally directed this disposal at Pennsylvania because Mobil was incorporated in and known to do business in Pennsylvania and because HLR's New Jersey facilities were near the Metro Container Site.

Metro cites a 1988 case from the District of Rhode Island, *O'Neil v. Picillo*, 682 F. Supp. 706, 710 n.1 (D.R.I. 1988), *aff'd*, 883 F.2d 176 (1st Cir. 1989), to guide the Court's analysis of purposeful direction in the CERCLA context. While this Court is by no means bound by the *O'Neil* opinion, the analysis is useful for assessing the unique specific personal jurisdiction issues that arise in CERCLA cases. Citing the legislative history of CERCLA, the *O'Neil* court noted that a motivation for CERCLA as a federal statute was that "midnight dumpers ha[d] trucked wastes from all over the Eastern Seaboard and dumped them illegally at various sites through Pennsylvania." *Id.* at 710 n.1 (quoting 126 Cong. Rec. H11,798 (remarks of Rep. Edgar) (daily ed. Dec. 3, 1980)). The court also noted that "[i]f some defendants are not subject to the jurisdiction of the court in which the main [CERCLA] action is brought . . . and fractionated

proceedings in other states ensue, the proper resolution of these issues will inevitably be complicated and impeded." *Id.*

The *O'Neil* court found specific jurisdiction over out-of-state generators despite their disavowal of "any knowledge of how waste allegedly generated by them came to rest at the [] site" and their claim that they lacked any significant ties to the forum state because "it has generally been recognized[] that the nature and significance of the state's interest may have a bearing on the nature and extent of the necessary contacts." *Id.* at 710, 718.   In discussing Due Process considerations, the court came close to carving out a notable CERCLA-oriented route for traversing the specific jurisdiction landscape and noted that when the "defendants dispatched volatile and inherently dangerous toxic substances," case law "dealing with an ordinary product" is not directly applicable, and that defendants operating in a nationally-regulated industry can expect to be sued in other states. *Id.* at 718–19.   Metro cites no CERCLA case law to the contrary.

"A defendant's contacts, however, must amount to 'a deliberate targeting of the forum.'" *D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 103 (3d Cir. 2009) (quoting *O'Connor*, 496 F.3d at 317).   Based on the unique CERCLA considerations in this case, the Court will deny HLR's motion without prejudice and grant jurisdictional discovery to determine the nature of the contractual relationship between HLR and its third-party transporters in order to better understand what HLR knew at the time of disposal.[7]   Although Metro has

---

[7] At oral argument, HLR argued that Mobil is part of the Metro group, and that Metro is better positioned to obtain such documents. In its supplemental briefing, Metro argues that the records with "Mobil" on them do not show that Mobil was a transporter, that "there is no basis to assume Mobil was a transporter," and that, in fact, Mobil was a refiner, not a transporter. Doc. No. 2343, at 2. But Metro bears the burden of establishing jurisdiction because HLR has challenged this Court's jurisdiction. *Mellon Bank*, 960 F.2d at 1223. This argument also appears to contradict Metro's argument that "the Court can easily draw the inference that HLR intentionally directed its disposal at Pennsylvania" because "Mobil was incorporated in and known to do business in Pennsylvania." Doc. No. 2246, at 12.

previously excused HLR from discovery, the Court will allow limited discovery on specific personal jurisdiction to resolve this narrow issue.

### 2. Zenith Home

Zenith Home could also be subject to specific personal jurisdiction if jurisdictional discovery supports a theory of successor liability for Zenith Products. As with HLR, however, specific personal jurisdiction over Zenith Home would require demonstrating purposeful availment. This becomes more complicated for Zenith Home because the issue is whether its alleged predecessor, Zenith Products, engaged in such purposeful availment. Because establishing general personal jurisdiction would render the issue of specific personal jurisdiction superfluous, the Court will exercise its discretion to limit jurisdictional discovery to the question of successor liability as it relates to general personal jurisdiction over Zenith Home.

## II.   Statute of Limitations

### a.   Parties' Arguments

Houff Transfer, AMF Automation Technologies, and NRG Heat & Power each argue that they should be dismissed based on expiration of the statute of limitations for the same reasons as D&B Express. Each defendant, like D&B Express, was not served the Original Complaint and Metro does not dispute that each defendant lacked notice of the complaint before service of the First Amended Complaint.

Metro contends that its First Amended Complaint tolled the statute of limitations and the question is whether each defendant received notice of the action by August 1, 2019, within the extended Rule 4(m) period for service of the First Amended Complaint. Metro also argues that "the relation back doctrine is concerned with notice of the *action*, not of the *complaint*" and that "[t]his is an argument that Plaintiff did not brief as fully in response to D&B Express's Motion for Reconsideration." Doc. No. 2189, at 4.

b. Analysis

"[T]he touchstone for relation back is fair notice, because Rule 15(c) is premised on the theory that 'a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide.'" *Glover v. FDIC*, 698 F.3d 139, 146 (3d Cir. 2012) (quoting *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984)). Such "notice does not require actual service of process on the party sought to be added; notice may be deemed to have occurred when a party who has some reason to expect his potential involvement as a defendant hears of the commencement of litigation through some informal means." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 195 (3d Cir. 2001).

The three-year statute of limitations for the instant action expired on August 27, 2018.[8] Metro filed this lawsuit on August 24, 2018 and filed a motion for a stay on August 27, 2018. The Court granted Metro's stay request to allow Metro to "concentrate on settling with as many defendants as possible." Doc. No. 2 ¶ 12; Doc. No. 15 n.1. Then, on April 23, 2019, the Court extended Metro's deadline to file an amended complaint to June 1, 2019 and extended the Rule 4(m) service deadline for such an amended complaint to August 1, 2019. Metro argues that this order also extended the notice period during which an amended complaint may relate back to satisfy the statute of limitations. This begs the question: to *what* would the amended complaint relate back?

---

[8] Metro also asks the Court to shift the statute of limitations deadline from August 27, 2018 to September 1, 2018 and September 2, 2018 based on the effective dates of the two settlement agreements underlying the action, rather than the date that both agreements were executed. Doc. No. 2189, at 8 n.3. Although Metro seeks this determination "to provide clarity in the CERCLA legal landscape," Metro recognizes that this issue is "not determinative of this Motion." *Id.* The Court sees no reason to depart from the *New Castle County* approach previously cited. *Id.* (noting that the statute of limitations period begins to run on "the date of the consent decrees) (citing *New Castle Cty. v. Halliburton NUS Corp.*, 111 F.3d 1116, 1119 (3d Cir. 1997)).

The Third Circuit Court of Appeals has recently reiterated that an amended complaint that adds parties who did not receive notice of the action within the statute of limitations period does not relate back to the original complaint. *Riveros-Sanchez v. City of Easton*, 861 F. App'x 819, 823 (3d Cir. 2021). Although Metro argues that the extended Rule 4(m) deadline for service of the First Amended Complaint tolled the statute of limitations, as Metro itself notes, "the manner and timing of serving process are generally nonjurisdictional matters of procedure." Doc. No. 2139, at 10 (quoting *Henderson v. United States*, 517 U.S. 654, 656 (1996)). Metro cites no case law to support the proposition that extending the technical deadline to formally serve a defendant under Rule 4(m) also expands the substantive time period in which a defendant must receive notice for relation back purposes. Further, the Court's April 23, 2019 order extended the service deadline for an amended complaint; it did not address the Original Complaint. The Court did not—and could not—extend the statute of limitations to allow Metro to add new defendants without prior notice of the action for relation-back purposes. *Riveros-Sanchez*, 861 F. App'x at 823.

As in *Riveros-Sanchez*, "[t]he amended complaint cannot 'relate back' under Rule 15(c)(1)(A) and (B) because, under Pennsylvania law, a plaintiff may not amend a pleading to add a new and distinct party once the statute of limitations has expired. Nor does the amended complaint 'relate back' under Rule 15(c)(1)(C), as the record lacks any facts suggesting that [the defendants] had actual or imputed notice of Plaintiffs' lawsuit during the limitations period." *Id.* (internal quotation omitted); *see also Estate of Grier ex rel. Grier v. Univ. of Pa. Health Sys.*, No. 07-cv-4224, 2009 WL 1652168, at *4 (E.D. Pa. June 11, 2009) ("Absent a showing that the proposed new Defendants had actual, constructive, or imputed notice of this action, the notice requirement of Rule 15(c)(l)(C)(i) has not been met and Plaintiffs proposed First Amended

Complaint cannot relate back to the date of the original Complaint."). The Court applies this analysis to each defendant in turn.

### 1. Houff Transfer

Metro named Houff Transfer as a defendant in the Original Complaint on August 24, 2018. However, like D&B Express, Metro did not file a proof of service for Houff Transfer and voluntarily dismissed Houff Transfer in February 2019. Houff Transfer argues that, like D&B Express, it did not receive notice of the lawsuit prior to service of the First Amended Complaint in June 2019.[9]

However, Metro argues that the First Amended Complaint relates back to the Original Complaint. According to Metro, "[t]he Amended Complaint clearly satisfies Rule 15(c)(1)(B), because it asserted the same claims arising out of the same conduct, transaction or occurrence as the original Complaint. The primary issue is notice." Doc. No. 2189, at 13. Metro then argues that "Houff Transfer had actual notice of this case at least as early as June 7, 2019" and that this predates the extended Rule 4(m) deadline of August 1, 2019 for service of the First Amended Complaint. Doc. No. 2189, at 16.

While Metro contends that the relevant question is whether a party was aware of the action generally rather than a specific pleading, Metro does not allege that Houff Transfer had notice of *either* the action or a specific pleading before service of the First Amended Complaint.[10] Metro asks the Court to allow the First Amended Complaint against Houff Transfer to relate back to the Original Complaint. Yet Metro has failed to raise any basis upon which to conclude that Houff

---

[9] Houff Transfer attaches an affidavit to support this claim. *See* Doc. No. 2157-2 ¶¶ 3–4.
[10] The Court also notes that Metro's argument on this point is misplaced. While the "critical inquiry" is indeed notice of the *action*, such an inquiry is made in order to determine whether an amended complaint relates back to the *original complaint*. Metro obfuscates the "back" in "relation back" by attempting to excise the concept of the original complaint from this analysis.

Transfer had actual, constructive, or imputed notice of the action prior to the First Amended Complaint that would allow the First Amended Complaint to relate back. Therefore, the First Amended Complaint does not relate back to the Original Complaint to satisfy the statute of limitations.

Houff Transfer differs from the other moving parties in that it styles its filing as a motion for judgment on the pleadings. Metro contends that Houff Transfer is not entitled to a judgment on the pleadings because a Rule 12(c) motion "only has utility when all the material allegations of fact are admitted in the pleadings and only questions of law remain." Doc. No. 2189, at 9 (quoting *Inst. for Sci. Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.*, 931 F.2d 1002, 1005 (3d Cir. 1991)). Metro argues that Houff Transfer denies allegations in its Answer to the Second Amended Complaint, so "[t]his proves that there are disputed issues of fact precluding judgment on the pleadings . . . ." *Id.* However, the "material allegations of fact" for the statute of limitations challenge are not disputed. Houff Transfer provides an even earlier date of actual notice than Metro does, stating that it received actual notice of the case being filed on June 3, 2019 when Metro served its First Amended Complaint. Metro does not dispute Houff Transfer's assertion that "Plaintiff did not serve Houff Transfer with this Complaint or provide any notice to Houff Transfer of the existence of the [Original] Complaint." Doc. No. 2157-1, at 2. Therefore, there are not disputed issues of fact material to the statute of limitations issue that preclude judgment on the pleadings.

Metro also argues that any dismissal of Houff Transfer should be without prejudice because a dismissal with prejudice could result in Metro having to file a separate case once a future Environmental Protection Agency administrative order for remedial action is issued. Doc. 2189, at 7. Metro contends that this Court is incorrect in its assessment that such a new order would

create a new cause of action in any case. *See* Doc. No. 2135, at 8 n.3. Metro argues that "[b]ecause this Site is relatively early in the cleanup process, there will inevitably be *at least* one more administrative order after EPA issues a Record of Decision selecting the final remedy for the Site" and a dismissal with prejudice requires Metro to "file a *separate case* against [each dismissed defendant] *in this court* once the inevitable administrative order for remedial action issues." Doc. No. 2189, at 7 (emphases in original). However, as Metro itself acknowledges, "[w]ith each administrative order, Plaintiff has a new cause of action for contribution for costs incurred under such order." *Id.* As this Court has already explained, the only claims that are dismissed with prejudice are those discrete claims that were untimely under the statute of limitations for the instant causes of action. The dismissal of these claims with prejudice has no bearing on any future claims or new causes of action against Houff Transfer that may arise in this case under a later triggering of a statute of limitations.[11]

As this Court has previously explained, a dismissal based on the statute of limitations has the effect of a dismissal with prejudice. *See Brennan v. Kulick*, 407 F.3d 603, 606 (3d Cir. 2005). Because Metro's First Amended Complaint does not relate back to the Original Complaint to meet the statute of limitations, to underscore the point Metro's claims against Houff Transfer will be dismissed with prejudice.

### 2. AMF Automation Technologies

AMF Automation Technologies also argues that the statute of limitations for claims against it expired based on lack of notice, along with use of different names in the Original Complaint and First Amended Complaint. In the Original Complaint, Metro asserted claims against "AMF

---

[11] Metro argues that "[i]t is not at all clear that Plaintiff could do so from the cases the Court cited in its D&B Express Ruling (Dkt. No. 2135, at 8 n. 3)," without further elaboration. Doc. No. 2189, at 6 n.1. In the absence of an explanation for this position, the Court will not make arguments for Metro.

Bowling Centers, Inc." Metro did not file a proof of service, and then voluntarily dismissed AMF Bowling in March 2019. Then, in the First Amended Complaint, Metro named "AMF Machinery Systems, Inc." On June 5, 2019, Metro contacted AMF Automation Technologies President Kenneth Newsome to request a waiver of service (naming him "erroneously" as President of AMF Machinery Systems, Inc.), and attempted service on August 5, 2019. The parties dispute whether AMF Automation Technologies and AMF Machinery Systems are related entities. On November 13, 2019, Metro sought leave to substitute AMF Automation Technologies for AMF Machinery Systems in its First Amended Complaint based on the inaccurate assertion that Metro named AMF Machinery Systems in the Original Complaint. The Court granted the motion, but Metro did not make this change until filing the Second Amended Complaint on April 29, 2020. Metro now seeks to include AMF Automation Technologies in the successor liability discovery.

Even if successor liability applies, however, the critical issue for the statute of limitations analysis is whether the First Amended Complaint relates back to the Original Complaint. Metro contends that "through the relation-back doctrine under Fed. R. Civ. P. 15(c), [its] claims are not barred by the statute of limitations and AMF Automation had adequate notice of Plaintiff's claims." Doc. No. 2134, at 3. AMF Automation Technologies contends that it did not learn about the action until June 2019 when Metro requested waiver of service for the First Amended Complaint. Metro alleges no basis on which this Court could find that AMF Automation Technologies had notice of the action before the service attempt of the First Amended Complaint.

Metro instead contends that the Court "has already ruled on the issue of granting the Plaintiff leave to amend the Complaint to substitute AMF Automation (Dkt. No. 1942), and that the Amended Complaint relates back to the original Complaint." Doc. No. 2134, at 10. This argument fails for several reasons. First, Metro obtained leave to amend through an inaccurate

representation that it named AMF Machinery Systems in its Original Complaint. Second, the key issue for the statute of limitations is not whether AMF Automation Technologies was properly named, but rather, whether AMF Automation Technologies had notice of the action. Third, the Court has not found, as Metro suggests, that the Amended Complaint relates back to the Original Complaint for all defendants regardless of notice. Because Metro does not demonstrate that AMF Automation Technologies was aware of the action before service of the First Amended Complaint, it does not relate back to the Original Complaint. Metro's claims against AMF Automation Technologies will be dismissed with prejudice for the same reasons discussed above.

### 3. NRG Heat & Power

NRG Heat & Power ("NRG") was not named in the Original Complaint and asserts that it did not have "any notice—actual, constructive or otherwise—of the Action" until service of the First Amended Complaint on July 15, 2019. Doc. No. 2105, at 1–2. NRG joins in AMF Automation Technologies's motion to dismiss based on the statute of limitations.

Metro argues that "NRG had actual notice of this case at least as early as June 2019" when it was delivered a service waiver package for the First Amended Complaint. Doc. No. 2139, at 11. Metro again argues that notice before the extended Rule 4(m) deadline should allow the First Amended Complaint to relate back to the Original Complaint. This argument fails for the same reasons discussed above.

Metro further asserts that successor liability discovery is necessary to determine whether NRG is the successor in interest to Liberty Oil Company, which was named in the Original Complaint, and dismissed on November 29, 2021. However, regardless of whether NRG is a successor to Liberty Oil, Metro alleges no facts that would allow this Court to infer that NRG received notice through Metro naming Liberty Oil in the Original Complaint. Absent notice of the

action through Liberty Oil or otherwise, the First Amended Complaint cannot relate back to the Original Complaint and thus fails to satisfy the statute of limitations. Metro's claims against NRG will also be dismissed with prejudice.

## CONCLUSION

For the aforementioned reasons, the Court will dismiss Metro's claims against Houff Transfer, AMF Automation Technologies, and NRG Heat & Power with prejudice. The Court will deny Hoffman-La Roche and Zenith Home's motions without prejudice, pending jurisdictional discovery. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE